608 So.2d 97 (1992)
Alice M. SCHAFRATH, Appellant,
v.
MARCO BAY RESORT, LTD. and FEISCO and Youth Haven, Inc. and Liberty Mutual Ins. Co., Appellees.
No. 91-1613.
District Court of Appeal of Florida, First District.
October 29, 1992.
Rehearing Denied December 7, 1992.
Richard I. Cervelli, Naples, Bill McCabe of Shepherd, McCabe & Cooley, Longwood, for appellant.
Gerald W. Pierce of Henderson, Franklin, Starnes & Holt, P.A., Fort Myers, for appellees Marco Bay Resort, Ltd. and Feisco.
Nancy A. Blastic of O'Riorden, Mann, Hootman, Ingram & Dunkle, P.A., Sarasota, for appellees Youth Haven and Liberty Mut. Ins. Co.
PER CURIAM.
The claimant, Alice Schafrath, appeals an order denying her claim for workers' compensation benefits. We reverse, holding that the judge applied an erroneous burden of proof.
Claimant sustained an injury to her right elbow on January 26, 1990, while working as a waitress and cook at Marco Bay Resort. *98 The injury occurred when her elbow was struck by double swinging cafe doors through which she was required to walk in carrying out the duties of her employment. The force of the blow knocked the food off the tray she was carrying. Her right arm had been hit by the swinging door on prior occasions, but this time she experienced sharp pain and numbness in the arm. She reported the accident to her supervisor and at the end of the day went to the nearby Urgent Health Care Center for authorized medical treatment. There, she was examined, her arm was x-rayed, and she was told that she had bruised her arm but was not instructed to refrain from working. Consequently, she returned to work and resumed her usual activities until March 6, 1990, when she was again hit by the door. She testified that she was in pain between January 26 and March 6, and that she encountered increasing difficulty lifting things.
On March 6, Claimant saw Dr. Saitta pursuant to authorization by the employer, Marco Bay. Dr. Saitta obtained from Claimant a history of injury when the cafe door hit her right elbow in January and resulting pain and soreness continuing from that occasion. Dr. Saitta's examination revealed pain on movement of the wrist, hand, and forearm, and that palpation of the lateral aspect of the elbow caused pain. He diagnosed her condition as right epicondylitis and tendonitis, which he described in his medical notes as a "severe case." He explained that this condition is an inflammation of the tendon attached to the bone, and is commonly known as "tennis elbow." Claimant was instructed to cease working and using the elbow, was provided with a supportive sling, and was given treatment with acupuncture, ultrasound, and physical therapy several times a week. Doctor Saitta's medical notes indicate that Claimant continued to complain of pain on these visits. On the visit of March 31, Claimant was much improved and was released by Dr. Saitta to return to work.
In the meantime, Claimant stopped working at Marco Bay as instructed by Dr. Saitta and lost her position. She found employment with Youth Haven performing the duties of cook, although at reduced wages. At Youth Haven's request, after Claimant told them about her elbow problems, she obtained a medical slip from Dr. Saitta that recited Claimant "has been discharged from my care on 4/2/90." She commenced employment with Youth Haven on April 6. According to her testimony, Claimant continued to have pain in her right arm, especially when lifting things, and the more she used the arm the more it hurt. On April 26, while working at Youth Haven, Claimant picked up a gallon container of milk but dropped it when she experienced a sharp pain in her arm. The next day she went to Dr. Saitta, and he instructed her to discontinue working. His examination revealed that Claimant suffered pain with movement of the arm, wrist, and hand, and that palpation revealed extreme tenderness of the elbow area. On May 1, 1990, Dr. Saitta notified Marco Bay's carrier, FEISCO, that Claimant "came back to the office with the chief complaint of pain in the elbow. This represents a continuation of her previous injury to the elbow (chronic epicondylitis)." Claimant continued under Dr. Saitta's care and treatment until she returned to work for yet another employer on November 11, 1990. She claims that she still suffers pain in her arm and cannot perform all of the physical activities required in her current employment.
Claimant was evaluated by Dr. Kapp, an orthopedic surgeon, on January 17, 1991, at the request of Youth Haven and its carrier, Liberty Mutual. Dr. Kapp obtained from Claimant a history of injury and pain in the right elbow, and he found tenderness on palpation of the elbow area. His diagnosis was chronic lateral epicondylitis in the right elbow, which he causally related to the January 26 accident.
Claimant filed workers' compensation claims for benefits against both Marco Bay Resort and Youth Haven. The judge of compensation claims denied all benefits from either employer, reciting in part:
(4) Following the January 26, 1990 accident, the claimant came under the care *99 of Dr. Richard Saitta, M.D. Dr. Saitta, who testified by deposition, was of the opinion that the January 26, 1990 accident caused the claimant to suffer from or aggravated her condition of right elbow epicondylitis (tennis elbow). Based upon the deposition testimony of Dr. Saitta, it is found that the claimant reached maximum medical improvement from the January 26, 1990 accident on March 31, 1990. She had no permanent physical impairment at that time. Although Dr. Saitta released the claimant to return to "light duty," it appears that the only reason for this restriction was Dr. Saitta's concern that after having been off work and restricted in the use of her arm, the claimant needed to gradually return to full use of her arm. It is found, nevertheless, that the claimant had essentially fully recovered from the January 26, 1990 accident as of March 31, 1990. It is noted that the claimant was actually released for work effective April 2, 1990.
(5) The claimant, shortly after reaching maximum medical improvement (March 31, 1990), became employed by Youth Haven as a cook. Youth Haven is a residential facility for troubled (abused) youths. On April 26, 1990, while preparing a meal, the claimant testified that she lifted a gallon container of milk. She testified that she immediately felt the sudden onset of pain in her right elbow.
The claimant, however, does not believe that she suffered an accident on April 26, 1990. It is the claimant's position that the onset of pain is either the natural progression of the initial injury by accident or is nothing more than a temporary exacerbation. The claimant testified that following the first accident of January 26, 1990, she had been experiencing ever increasing elbow pain. She testified, in detail, as to the pain she was experiencing while employed by Youth Haven. Employer/carrier No. 2 [Youth Haven and Liberty Mutual] obviously adopts this position of the claimant and argues that the incident of April 26, 1990, was not an accident or in the alternative was nothing more than a temporary exacerbation of the claimant's preexisting condition.
(6) The undersigned has had the opportunity to observe the claimant's demeanor and fully consider her live testimony. The undersigned has carefully read and considered the deposition testimony of Dr. Saitta. A fair reading of Dr. Saitta's testimony is that the claimant was essentially complaint free as of March 31, 1990. There is a conflict between the claimant's testimony and that of Dr. Saitta. The claimant is extremely articulate and presentable. She did not, however make a convincing, creditable witness with regard to her testimony of pain in her right elbow preceding her second injury. According to the claimant, she had ever increasing complaints of elbow pain. Dr. Saitta testified that as treatment progressed, the claimant had fewer and fewer complaints and by March 31, 1990, had fully recovered from the January 26, 1990 accident. In resolving this conflict, the undersigned rejects the testimony of the claimant with regard to her claimed complaints of increasing pain leading up to and on March 31, 1990. Specifically with respect to the claimant's condition on March 31, 1990, the claimant presented herself to Dr. Saitta as being recovered from her accident but now testifies that she, in fact, was still experiencing pain. The undersigned simply concludes that the claimant's testimony is not reliable on this point and therefore rejects that portion of her testimony.
(7) Dr. Saitta, in his deposition, relates the claimant's present complaints to a "reinjury" for which he saw her on April 27, 1990, the day after the incident of lifting the milk container. The claimant did not, however, advise Dr. Saitta of this lifting incident. Although Dr. Saitta was of the opinion that the claimant suffered a reinjury (a new injury) to her elbow when he saw her on April 27, 1990, he was never asked by hypothetical whether the lifting of the milk container was the probable cause of this new injury. Even assuming that Dr. Saitta's testimony can be construed as causally relating the claimant's condition to this second *100 incident, that opinion is rejected as being based on allegations which have not been established. Specifically, Dr. Saitta's opinion, on this point, is based on the claimant being relatively symptom free until the second accident. This fact cannot be established nor found. The claimant testified she was having pain prior to the second incident. What the undersigned has rejected is that the claimant was having pain when she reached MMI. The undersigned has not rejected the claimant's testimony that she was having pain sometime thereafter but before the second accident.
The claimant was seen by Dr. Howard Kapp, M.D., an orthopedic surgeon, for an IME on January 17, 1991. Dr. Kapp testified by deposition taken March 8, 1991. Dr. Kapp causally related the claimant's present condition and complaints to the January 26, 1990 accident. It was his opinion that the milk lifting incident of April 27, 1990 was merely an exacerbation of the claimant's preexisting condition. Dr. Kapp based his opinion on causal relation primarily upon the claimant's history of continued elbow pain following the first accident and preceding the second incident of April 26, 1990. As noted above, that history has been rejected. Having rejected the claimant's history of complaints, Dr. Kapp's opinion as to the claimant's present condition being causally related to the first accident is rejected. Dr. Kapp's testimony that the milk lifting incident of April 26, 1990, caused a temporary exacerbation of the claimant's preexisting condition is difficult to accept or reject. One can only speculate what opinion Dr. Kapp would express if the facts were as found in this order. It is, however, concluded that if the claimant did sustain a compensable injury as the result of an industrial accident which arose out of and in the course and scope of her covered employment with Youth Haven on April 26, 1990, that injury, at most, caused an exacerbation. Dr. Kapp, who only saw the claimant for an IME, did not express an opinion as to what medical treatment or disability might be causally related to such a temporary exacerbation. There is insufficient evidence in the record upon which an award of medical or indemnity benefits can be made against employer/carrier No. 2 as the result of this temporary exacerbation.
(8) This case is both unusual and difficult. This is because of two facts: First, as indicated above, the claimant has not been truthful. She has testified to complaints of great pain prior to the second incident. If she was in fact having this pain prior to that second incident, it is questionable whether that pain was causally related to her first accident. This is because of the accepted testimony of Dr. Saitta, who found her to have reached MMI with no impairment nor restrictions. It is probable that if she was having pain prior to the second incident, that this pain began after she was released by Dr. Saitta as being at MMI from the first accident. This situation would then suggest that the claimant, at most, suffered a temporary exacerbation as the result of the second accident. It would also suggest the possibility of either a spontaneous return of symptoms following the first accident or some intervening incident prior to the reported second incident. Under this scenario, the claimant's present complaints and condition may or may not be related to either accident. After observing the claimant and considering her testimony and that of Dr. Saitta, the undersigned simply does not find the claimant's testimony to be creditable or reliable. It is not accepted.
The second problem in this case is the medical evidence. As found above, Dr. Saitta, while testifying to a reinjury being present the day after the second accident, did not specifically relate that reinjury to the second accident. Even interpreting his testimony as causally relating the claimant's present condition to that second incident, that opinion is based on the assumption that the claimant was relatively pain free following MMI until shortly before he saw her the day after the second accident. That assumption is not factually established in this case. *101 The claimant testified she was having pain prior to the second accident.
It is difficult to understand why the claimant has testified as she did. One can only speculate. Whatever the reasons, the claimant has failed to meet her burden of proof in this case. With the repeal of Section 440.26, Florida Statutes, which provided for the presumptions in favor of claimants in workers compensation cases, and with the enactment of Section 440.015, Florida Statutes, which abolished the concept of liberal construction in favor of claimants, a claimant must establish a prima facie case based on a preponderance of competent, substantial evidence in order to establish causal relationship. The facts and testimony in a case should not be viewed only in a light most favorable to the claimant. The facts and testimony must be fairly and objectively considered with the rights of both parties in mind. Although the facts and evidence in this case could be interpreted in such a way as to find the claimant's present condition to be compensable, to do so would require the undersigned to ignore the 1990 amendments and 1991 Special Session (reenactment) amendments to the Workers' Compensation Law.
We have quoted the appealed order at length to illustrate the difficulty experienced by the judge of compensation claims in arriving at an interpretation of the facts presented in this record, a difficulty we readily understand after carefully reviewing the record. This difficulty can be attributed in significant part to the fact that Dr. Saitta's deposition reflects considerable difficulty understanding the English language and the legal concepts involved. The judge ultimately resolved the issues by ruling that Claimant had not carried her burden of proof under recent amendments to chapter 440, Florida Statutes.
Claimant contends that the judge of compensation claims erred by imposing an incorrect burden of proof on her. In particular, Claimant argues that, based on the recitations in the order under review, she was held to prove her case by a preponderance of the evidence, although that is clearly not the applicable burden of proof in workers' compensation cases. Further, she argues, neither of the statutory enactments referred to in the order altered the burden of proof applicable in this case because, first, the 1990 amendments are not applicable to accidents occurring before their effective dates, and second, these amendments were not intended to alter or modify the established burden of proof in workers' compensation cases. Marco Bay and its carrier agree with Claimant that the 1990 amendments did not modify the applicable burden of proof, but argue that the evidence was sufficient to sustain the findings in the appealed order. Youth Haven and its carrier argue that "preponderance" and "competent substantial evidence" are synonymous terms and that the judge did not err in so equating their meaning. In any event, they continue, the statutory amendments are procedural only and can be given retroactive effect as done in the order.
We need not decide in this case whether the repeal of section 440.26(1)[1] and the enactment of section 440.015[2] *102 should be given retroactive effect. We do not reach this retroactivity issue because neither of these statutory provisions even purports to affect the operative burden of proof in workers' compensation cases. The claimant's burden of proof in workers' compensation cases was definitively described in Jones v. Citrus Central, Inc., 537 So.2d 1123, 1125-26 (Fla. 1st DCA 1989), wherein we quoted at length from the supreme court's exposition on that subject in Johnson v. Koffee Kettle Restaurant, 125 So.2d 297, 299 (Fla. 1960). It is well to recall again the essence of that discussion and the distinctions made by the supreme court between the preponderance of the evidence rule and the more lenient burden of proof in workers' compensation cases. In workers' compensation cases, the claimant must "prove or show a state of facts from which it may be reasonably inferred" that the claimant was injured during the course and scope of employment. 125 So.2d at 299. Thus, "[i]f the evidence to establish such a state of facts is competent and substantial and comports with reason or from which it may be reasonably inferred," then "it is sufficient." 125 So.2d at 299. The essence of the distinction between this standard and the preponderance of the evidence standard was described by Justice Terrell in Johnson:
Evidence to show a state of facts from which a conclusion may be reasonably inferred or that is substantial and comports with reason is markedly different from establishing by the preponderance of the evidence rule or the rule of proof to the exclusion of a reasonable doubt. The reason for this is grounded in the reason for workmen's compensation  a means devised to require industry to share with society the expense of injuries caused by it. This is why we are committed to the doctrine that when an injury is conclusively shown and a logical cause for it is demonstrated, he who seeks to defeat recovery has the burden of overcoming the established proof and showing that another cause is more logical and consonant with reason. Crawford v. Benrus Market, Fla. 1949, 40 So.2d 889.
Proof measured by preponderance of the evidence rule or the rule to the exclusion of a reasonable doubt would certainly contemplate the elimination of a degree of uncertainty not contemplated when measured by "reason," "reasonable inference" or that which "comports with reason" or "logic," such factors being the sole guide for measuring proof in many workmen's compensation cases. The human element that enters into these factors varies as the mind and emotions of men vary and they should not be measured by the preponderance of the evidence rule or the proof beyond the reasonable doubt rule. To so measure them will cut off many who are entitled to workmen's compensation.
Johnson v. Koffee Kettle Restaurant, 125 So.2d at 299, quoted in Jones v. Citrus Central, 537 So.2d at 1125-26.
Accordingly, the well established and long-standing rule is that a claimant's burden of proof in workers' compensation cases has been and is (unless modified by statute) significantly less than proof by a preponderance of evidence, fundamentally in the sense that the claimant is not held to eliminating the same degree of doubt or uncertainty inherent in the evidence that is required of a party in a court proceeding under the preponderance of evidence rule. These decisions indicate that an employee is only required to present, by competent, substantial evidence, a state of facts from which it may be found, consonant with logic and reason, that an injury was sustained during the course of and arising out of the employee's employment. The burden then shifts to the employer and carrier *103 to overcome this established proof and show by competent, substantial evidence that another cause is more logical and consonant with reason. We thus reject, on the cited authority, the argument that competent, substantial evidence is synonymous with the preponderance of evidence rule, and that the traditional burden of proof in workers' compensation cases is equivalent to proof by a preponderance of the evidence.
The materiality of the difference between these two rules is particularly apparent from the record and ruling in this case. The material significance of requiring Claimant to carry the heavier burden of proof is best manifested in the judge of compensation claims's repeated references to unexplained or incomplete factual matters that left open to speculation the cause of Claimant's continuing epicondylitis condition. The application of this heavier burden of proof ultimately led to the denial of all benefits for the reason that, as recited in the order, "although the facts and evidence in this case could be interpreted in such a way as to find the claimant's present condition to be compensable," nevertheless "to do so would require the undersigned to ignore" the amendments in 1990. This ruling can only mean that, simply stated, it is reasonable, logical, and permissible to conclude from the evidence that Claimant's condition is causally related to the combined effect of the January and April accidents, but that benefits must be denied because this conclusion was not proved by a preponderance of the evidence as required by the 1990 amendments. In view of this explicit ruling, we cannot treat as harmless the judge of compensation claims's application of the higher burden of proof rule.
While the judge of compensation claims cited the repeal of subsection 440.26(1) and the enactment of section 440.015 as authority for modifying the established burden in workers' compensation cases and applying the greater burden of proof, neither of these statutory provisions speaks in terms of burden of proof, and neither explicitly alters or modifies the burden of proof rule set forth by the supreme court in Johnson or this court in Jones.
Section 440.26 creates three rebuttable evidentiary presumptions to aid a claimant in proving a claim (see note 1). Subsection (1) establishes the presumption that the claim falls within the provisions of the chapter when an injury indisputably occurs on the job and no evidence of causation is available. This provision has been construed to mean that when conflicting evidence of causation exists, claimant must prove a causal connection without reliance on the presumption. Deahl v. Uni-Pak Corp., 550 So.2d 122, 123 (Fla. 1st DCA 1989). This subsection merely creates an evidentiary presumption that, in an appropriate case, could assist a claimant in proving that the injury occurred in the course of employment; it has nothing to do with defining the overall burden of proof on a claimant.
Section 440.015 likewise contains no explicit mention of the burden of proof (see note 2). The language employed in this section is anything but an example of good legislative draftsmanship, for it attempts to clarify legislative intent by confusing different legal concepts. In the final analysis, this section accomplishes nothing more than a statutory recognition of long-standing legal principles enunciated by Florida courts in workers' compensation cases.[3] *104 This section is obviously directed to precluding a judge of compensation claims from giving a "benefit of the doubt" to either the claimant or the employer when drawing inferences from predicate facts, a practice heretofore condemned by this court in Uniweld Products, Inc. v. Lopez, 511 So.2d 758 (Fla. 1st DCA 1987). Section 440.015 is lacking the kind of explicit language necessary to alter, modify, or repeal the established burden of proof rule applied in workers' compensation cases in this state for more than 30 years; thus, we are constrained by accepted principles of statutory construction to reject the argument that this statutory amendment accomplishes that objective. Akins v. Bethea, 160 Fla. 99, 33 So.2d 638, 640 (1948). See also 49 Fla.Jur.2d Statutes § 172 (1984).
Additionally, we add a note of caution regarding the practical effect of attempting to apply in workers' compensation cases the same burden of proof that is applied in civil court cases. The trial of civil court cases is a purely adversarial process that contemplates the moving party will prove asserted contentions by at least a preponderance of evidence, an endeavor that ordinarily requires the assistance of a lawyer (while pro se litigants can proceed without a lawyer, they rarely are competent to adequately protect their rights). This is especially true in proving disputed issues of causation, medical necessity, and the like. On the other hand, the Workers' Compensation Act creates a self-executing, non-adversarial system designed to function without the intervention of legal representatives in the vast majority of cases by placing on the employer and carrier the burden to "assure the quick and efficient delivery of disability and medical benefits to an injured worker at a reasonable cost to the employer," to quote from the recently enacted section 440.015. This approach has been most effective, as only a very small percentage of workers' compensation claims ever reach the litigation stage. On the other hand, should the Workers' Compensation Act require that each employee initially establish a claim for benefits by "a preponderance of the evidence" in order to hold the employer and carrier legally responsible for providing workers' compensation benefits (as in a civil court proceeding), few, if any, employees would be fully capable of preparing a legally sufficient claim and marshaling the proof necessary to meet that requirement without the intervention and assistance of skilled legal representation by legal counsel. Should that change in the standard of proof come about, it is evident that many more claims, not fewer claims, would go to litigation, contrary to the current legislative purpose to avoid as much as possible the necessity to employ attorneys to prosecute and defend workers' compensation claims. It takes little imagination to appreciate that a change in the burden of proof in workers' compensation cases from that discussed in Johnson and Jones to standards applicable in civil court proceedings would quickly change the workers' compensation scheme to a purely adversarial system and effectively scuttle the self-executing nature of the system. These additional considerations likewise support rejection of the argument that section 440.015 changed the burden of proof in workers' compensation cases.
Claimant also next argues that the evidence does not support the findings of fact relied on by the judge of compensation claims in reaching the decision to deny all benefits. Because the case must be remanded to the judge of compensation *105 claims for further consideration in light of the correct burden of proof, we do not believe that it is necessary to reach this issue at this time. However, because the decision below was based almost exclusively upon Dr. Saitta's deposition testimony, we note for the benefit of the parties and the judge that, after having carefully reviewed that testimony, we find it to be so confusing and riddled with inconsistencies as to be virtually indecipherable. To ensure that the parties receive a fair hearing, it may well be advisable on remand to obtain and consider further testimony from Dr. Saitta, or alternatively or in addition thereto, an independent medical examination by another physician.
The appealed order is reversed and this cause is remanded for further proceedings in accordance with this opinion.
REVERSED AND REMANDED.
MINER and WEBSTER, JJ., concur.
ZEHMER, J., concurs with opinion.
ZEHMER, Judge, concurring.
I fully concur in all respects in the panel opinion. I write only to express more fully the basis of my concern about the probative value of Dr. Saitta's deposition testimony as interpreted by the judge of compensation claims and some evidentiary issues that should be readdressed by the judge on remand.
The first matter of concern is the finding, principally in paragraph (4) of the order, concerning maximum medical improvement (MMI) from the January 26 accident with a complete absence of pain and no physical impairment. The recitations in that paragraph are not only internally inconsistent, but are based on a questionable interpretation of the record evidence. In paragraph (4), the judge of compensation claims found Dr. Saitta's deposition testimony sufficient to establish that Claimant reached maximum medical improvement from the January 26 accident on March 31, 1990, with no permanent impairment. Yet, it also recites that Claimant was released to return to "light duty" with restrictions on the use of her arm.[1] The order attempts to reconcile these inconsistencies by rationalizing that "the claimant needed to gradually return to full use of her arms," and based on Dr. Saitta's testimony concludes, "nevertheless, that the claimant had essentially fully recovered from the January 26, 1990 accident as of March 31, 1990."
First, these findings and conclusions are not consistent with the statutory definition of the "date of maximum medical improvement," defined in subsection 440.02(8), Florida Statutes (1989), as "the date after which further recovery from, or lasting improvement to, an injury ... can no longer reasonably be anticipated, based upon reasonable medical probability." The fact that Claimant was required to restrict her activities immediately upon returning to work, after having not used her arm for approximately four weeks while she was receiving physical therapy, acupuncture, and ultrasound treatment in contemplation of an anticipated return to full use of her arm, can only mean that claimant is expected to undergo "further recovery" from the injury to her elbow before reaching her physical status as it existed prior to the January injury.
Moreover, Dr. Saitta's deposition testimony never stated that his opinion regarding maximum medical improvement was "based upon reasonable medical probability," as required by subsection 440.02(8), undoubtedly because he was never asked that important question. The record also indicates that Dr. Saitta manifested an inaccurate understanding of the statutory meaning of the term "maximum medical improvement," and it does not appear that the doctor was ever advised of the statutory definition or meaning. For example, Dr. Saitta explained that he placed Claimant on light duty when she returned to work the first of April because:

*106 Well, you know, it's like a training, you cannot send a patient right away and tell them to do your maximum, you know, and run the chance to reinjure itself or himself. So you want to prove that the duty she was doing before, you know, can be compatible to her physical condition.

(Emphasis added.) Dr. Saitta further stated that Claimant had reached MMI from the April "aggravation" to the preexisting condition when he last saw her on November 11, 1990, at which time he released her to return to light duty with lifting restrictions ("She shouldn't lift anything.") It is apparent that Dr. Saitta was equating MMI with the ability to return to work rather than the statutory definition, and at no time did Dr. Saitta predicate any opinion of MMI on reasonable medical probability.
It is also evident from Dr. Saitta's testimony that the April incident aggravated the epicondylitis condition originated by the January injury, a concept that necessarily connotes a continuing adverse effect from the previous injury. In response to the question whether he concluded that Claimant, when he saw her on April 27, had an exacerbation of a preexisting condition, he responded, "I believe that it may be an aggravation." He insisted on using the term "aggravation as opposed to exacerbation" because "she was worse when she came, you know, worse from the first time I saw her as far as pain."[2] When asked whether the "aggravation" was temporary or permanent, he responded that he could not say, although it appeared to be temporary because Claimant was now better than when he saw her on April 27, but she has never returned to the point she was on March 31. On the face of a letter dated April 20, 1990, written by Marco Bay's carrier, FEISCO, inquiring about Claimant's status, Dr. Saitta wrote in his own handwriting that Claimant "came back to the office with the chief complaint of pain in the elbow" and that, "This represents a continuity of her previous injury to the elbow (chronic epicondylitis)." He explained this handwritten comment as follows:
Well, when you have a reinjury then you fall into the term chronic, you know, chronicity. It becomes chronic because you can reinjure the same place 10 times so it becomes a chronic case of fragility of this place, that's all. If you have a weak point then you become chronic and you can reinjure it.
Consequently, he wrote to FEISCO, in response to this inquiry, that on April 26 Claimant "evidently reinjured her elbow."
It seems to me, based on the deposition testimony, that Dr. Saitta was using the term "reinjure" in respect to the April 26 incident at Youth Haven in the sense it constituting an aggravation of the original January injury. For example, having emphatically characterized Claimant's pain on April 27 as an "aggravation," Dr. Saitta further testified:
Q: Okay. And when you last saw her prior to that on March 31, '90, do you have an opinion as to whether or not she had an elbow that was going to be painful on activity?
A: You mean when I discharged her?
Q: When you discharged her on March 31, '90?
A: That was, you know,  my recommendation is you could  you could feel pain again. That's why you have to be cautious.
Q: Okay. And the reason then that you released her to light duty was that the more active the arm was, the more pain she would have; is that a fair statement?
A: Well, not pain but she could  I use the word reinjure. She could again hurt herself the same place.
Q: Well, are we talking about hurting herself? Would just movement of the arm hurt or cause a new injury or aggravate the original injury? That happens to be the issue in this case so I have to ask you the question. Is moving her *107 arm going to aggravate her preexisting condition and cause her pain?
A: If we talked about the same work probably aggravate the same injury. You know, you're talking about a football player playing football and twisting the ankle, you know, having a sprain in the ankle. He recover from that. Now he goes back to play football and come back with the same injury, what you call this?
Q: Well, that's why we're asking you because you're the doctor. We're not.
A: Well, it's an injury  you can reinjure the same ligament by the same, you know.
Dr. Saitta was then specifically asked whether on April 26 Claimant had a new injury or an aggravation of the original January 26 injury, and he responded:
I mean, this question is as meaningless as yours, you know, and my  we're talking about a patient that had an injury to a tendon  to not attach of the bone  of the muscle to the bone and, you know, any type of movement can injure this tendon, you know.
Like I said lifting, pushing, flexing can reinjure that. Some are more prone. I cannot certify  I know that's the issue but I cannot. I mean, you're asking me something that I  only can I expect to answer that question, you know, because  sure, you know, she probably was weak over there but she hadn't fully recovered. But it's possible to reinjure and hurt the same tendon in the same place by doing the same activity or similar activity.
(Emphasis added.)
Dr. Saitta's testimony was essentially the sole evidentiary basis for the finding that Claimant had reached MMI without any pain or impairment on March 31, and that she did not suffer any accidental injury at Youth Haven during April that aggravated her prior condition. Yet Dr. Saitta's testimony was exceptionally equivocal, and taken as a whole provides questionable, if not legally insufficient, support for the finding of MMI based on a degree of reasonable medical probability as required by the statute. See Jones v. Citrus Central, Inc., 537 So.2d 1123 (Fla. 1st DCA 1989).
Second, the judge of compensation claims denied Claimant's claim for benefits principally on the finding of a direct and irreconcilable conflict between Dr. Saitta's testimony that Claimant had reached MMI with no pain and permanent impairment on March 31 and Claimant's testimony that she still was suffering some pain on that date. While expressing consternation and ignorance as to why Claimant would so testify, the judge found her testimony on this issue lacking in credibility and rejected it, although her testimony on all other matters was accepted as credible. My reading of Dr. Saitta's and Claimant's depositions, as well as the abbreviated live testimony given by Claimant at the hearing, indicates that the apparent testimonial conflicts described in the order are not so irreconcilable that the judge was compelled to choose one version to believe and then reject the other.
Dr. Saitta was questioned about the truthfulness of Claimant's testimony that she was still having some pain on March 31 and had suffered pain while working at Youth Haven during April, and responded:
Q: That's not what she says. She said she continued to have pain in her arm until she came back to see you. If she says that, I mean, if that's her testimony that she was never pain free and that she felt that her arm never really healed, would you disagree with that?
A: I'm a physician, I have to believe my patient, you know. I mean, I don't think she's a malingering person. She's suffering and I try to solve her problem and that's why  she told me she was suffering, she has pain. I mean, my physical examination was  I always mentioned it, quite unremarkable except for the pain and the triggering of the pain by palpating and moving her arm.
Q: So really you couldn't find any objective problems wrong with her when she moved her arm, she just said it hurt?
A: That's right.

*108 Q: Okay. Now if you just assume that what she said today is true, that her arm never did become pain free 
A: Well, I have to believe her, I mean 
Q: Well, if you consider that to be true and this is what she said not more than two hours ago, that she was never pain free in that arm and the reason she went back to work is because she felt that she had to go back to work, if you assume that to be true, wouldn't then her problems that she's experiencing now and has been experiencing since April 27th be a continuation of the January problem?
* * * * * *
If you assume what she said to be true, that she was never pain free in her arm and that she never felt that she was healed, if you assume that that's true, wouldn't this condition now that you've been treating her be for a continuation of the January problem?
A: You see, I'm still quite different than your view of it. I call it as a reinjury because it could have been  it could be related to the other one. It could, you know. I mean, I took the example of the football player and 
Q: I understand, doctor, but just listen to my question. My question is 
A: I believe her. Yeah, I do.

Q: If she says she was never pain free, then wouldn't this be a continuation of the January problem?
* * * * * *
A: It goes against, you know, when I examined her and, you know, she could have experienced pain after that. Yes, she could.

Q: So would it be a  if it was true that she never was pain free, wouldn't it all be from the same beginning injury?

A: Of course, that's logical. I mean that's logical.

(Emphasis added.)
According to Dr. Saitta's testimony, Claimant was seeing him at least three times a week for therapy during the period from March 6 to March 31, and she usually complained of pain each time he saw her. He was then specifically asked about the March 31 visit and he responded as follows:
Q: All right. Did the patient have an improvement between March 19th and March 31st?
A: Well, on March 31st, yes, she was ready to go back to work. That's what she  she felt good.
Q: All right. I want to know what her symptoms and complaints were on March 31st. What symptoms and complaints did she render to you at that time?
A: She had minimum discomfort. I write down she had minimum discomfort. She was ready to go back to work.

Q: Did you run her through a range of motion at that time?
A: Sure, yeah.
Q: All right. And what did that consist of?
A: There was no limitation and there was no pain.
Q: None whatsoever?
A: No.
Q: She didn't report to you that she had any shooting pains at time?
A: No.
Q: She was pain free. Yes? No?
A: I didn't chart that, you know, but I think if she  she was feeling pretty good.

Q: Any other tests that were done other than a range of motion?
A: You know, palpation, the grip  the hand grip.
Q: Let's talk about each one of them. What about the palpation? What did you find?
A: Palpation was pain free.
Q: All right. What was another test you did?
A: Hand grip.
Q: Hand grip? What did that find?
A: She have equal strength with the other hand.
(Emphasis added.) This testimony, particularly the references to the medical note charting that Claimant was suffering "minimum *109 discomfort" and the fact that the doctor did not specifically chart that Claimant was pain free, does not support the finding that Claimant's testimony regarding her continuing pain from the January accident and Dr. Saitta's findings on that March visit are in irreconcilable conflict. His note indicating "minimum discomfort" obviously indicates some continuing discomfort and effect from the prior injury; otherwise, the note would have read "no discomfort." Moreover, the medical note indicates that Claimant did not suffer increased pain upon movement of her hand, wrist, and arm or palpation of the elbow. Dr. Saitta testified that he believed Claimant's statements and did not reject as untruthful her statements that she was still suffering from the consequences of the January injury. He found her complaints of recurring pain upon resuming work and using her arm at Youth Haven and a connection with the January injury to be entirely logical.
It is not my purpose, by this discussion, to take over the function of deciding the Claimant's credibility on this narrow factual issue; that fact-finding function must remain with the judge of compensation claims. Rather, it is my purpose to explain why the findings in the appealed order are not consistent with the evidence and the applicable law. Claimant's testimony at the final hearing was quite limited in view of her two lengthy depositions that were also put in evidence for the judge's consideration. Dr. Saitta's testimony was also presented by deposition. The law is settled that the appellate court is in as good a position as the judge of compensation claims to evaluate the credibility of a witness's deposition testimony, and that in doing so, the court should reconcile the doctor's oral testimony with his medical notes in evidence, if possible, especially when the doctor's medical notes can be interpreted to corroborate rather than impeach the claimant's testimony. Jones v. Citrus Central, Inc., 537 So.2d 1123, 1125, 1127 (Fla. 1st DCA 1989). I note that the judge below expressed considerable difficulty in understanding Claimant's testimony that she was not completely pain free on March 31 in view of her articulate presentation based on a perceived conflict with Dr. Saitta's testimony, and only point out that the described testimony is not necessarily irreconcilable.
In any event, the judge of compensation claims rejected Claimant's testimony not only for lack of credibility based on the perceived testimonial conflict but also on the finding that Claimant had reached MMI on March 31 with respect to the January 26 accident. Because the finding of MMI does not appear to be supported by competent, substantial evidence, as previously discussed, the issue of Claimant's credibility and the rejection of her testimony must necessarily be revisited on remand.
Finally, the judge should also revisit on remand his rejection of Dr. Kapp's testimony. The appealed order recited in paragraph 7 that Dr. Kapp's testimony causally related Claimant's present condition to the January 26 injury, but the judge rejected that testimony upon the finding that Claimant had reached MMI on March 31 with no pain whatsoever. The order recites that Dr. Kapp's opinion was based on the history of continuing pain given to him by Claimant that had been rejected for lack of credibility. Further reciting that it is difficult to accept or reject Dr. Kapp's testimony, the judge observed that "one can only speculate what Dr. Kapp would express if the facts were as found in this Order." Since Dr. Kapp was never asked whether his opinion on medical causation would change based on the facts as found by the judge, the judge should not have "speculated" that Dr. Kapp's professional opinion would have changed had he been given the different history. Nance v. School Board of Polk County, 582 So.2d 134 (Fla. 1st DCA 1991); Faucher v. R.C.F. Developers, 569 So.2d 794 (Fla. 1st DCA 1990); Jones v. Citrus Central, Inc., 537 So.2d 1123, 1127.
With these additional comments, I fully concur in the panel opinion.
NOTES
[1] Section 440.26, Florida Statutes (1989), provides:

440.26 Presumptions. Except as otherwise provided in this chapter, in any proceeding for the enforcement of a claim for compensation under this chapter, it shall be presumed, in the absence of substantial evidence to the contrary:
(1) That the claim comes within the provisions of the chapter.
(2) That sufficient notice of such claim has been given.
(3) That the injury was not occasioned by the willful intention of the injured employee to injure or kill himself or another.
Subsection 440.26(1) was repealed effective June 26, 1990, by chapter 90-201, section 26, Laws of Florida.
[2] Section 440.015, Florida Statutes (Supp. 1990), provides:

440.015 Legislative intent.  It is the intent of the Legislature that the Workers' Compensation Law be interpreted so as to assure the quick and efficient delivery of disability and medical benefits to an injured worker at a reasonable cost to the employer. It is the specific intent of the Legislature that workers' compensation cases shall be decided on their merits. The workers' compensation system in Florida is based on a mutual renunciation of common law rights and defenses by employers and employees alike. In addition, it is the intent of the Legislature that the facts in a workers' compensation case are not to be interpreted liberally in favor of either the rights of the injured worker or the rights of the employer. Additionally, the Legislature hereby declares that disputes concerning the facts in workers' compensation cases are not to be given a broad liberal construction in favor of the employee on the one hand or of the employer on the other hand.
[3] For example, the first sentence simply reiterates the basic purpose of workers' compensation legislation "to assure the quick and efficient delivery of disability and medical benefits to an injured worker at reasonable cost to the employer." No Florida court decision, so far as we are informed, has ever held to the contrary.

The second sentence simply affirms what courts have been doing for years, that is, deciding workers' compensation cases "on their merits."
The third sentence purports to memorialize the notion that the workers' compensation system is based on a mutual renunciation of common law rights and defenses by employers and employees alike. Coverage has been mandatory since the 1970 amendment to section 440.03, which section previously made coverage under the act elective on the part of either the employer or the employee. See § 440.03, Fla. Stat. (1969); Ch. 70-148, § 1, Laws of Florida.
The fourth and fifth sentences, stating that "the facts in a workers' compensation case are not to be interpreted liberally in favor of either" the employee or the employer, and that "disputes concerning the facts ... are not to be given a broad liberal construction in favor of" either the employer or the employee," merely codify the rule that the courts have followed in interpreting the facts in such cases. See, e.g., Uniweld Products, Inc. v. Lopez, 511 So.2d 758, 760 (Fla. 1st DCA 1987), wherein the court explained that when the language of the statute "is susceptible of disparate interpretations, the courts will adopt a construction which is most favorable to the claimant," but that "this rule [of statutory construction] does not require the deputy commissioner to give the claimant the `benefit of the doubt' in weighing conflicting evidence or, as in this case, to ignore evidence which indicates she is not entitled to additional benefits," when determining the facts in the case.
[1] Dr. Saitta testified that he told Claimant "not to carry trays, you know, heavy trays" weighing "more than three or four pounds." He also advised her to be "very cautious, you know, to prevent this injury, especially the door that was swinging, the swinging door."
[2] Dr. Saitta's testimony in this regard is wholly inconsistent with the findings in paragraph 7 of the order that the injury suffered by Claimant on April 26 at Youth Haven "at most caused an exacerbation."